IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 5, 2024

**CARLOS STOKES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 16-05861     Carlyn Addison, Successor Judge**
**James M. Lammey, Jr., Original Judge**

---

**No. W2023-00421-CCA-R3-ECN**

---

The Petitioner, Carlos Stokes, appeals the Shelby County Criminal Court's summary dismissal of his petition for a writ of error coram nobis from his convictions for first degree murder, conspiracy to commit first degree murder, reckless endangerment, two counts of attempted first degree murder, and two counts of employing a firearm during the commission of a dangerous felony, for which he received a sentence of life imprisonment plus fifty-four years. He contends that he is entitled to equitable tolling of the statute of limitations and requests that this court appoint a special judge to preside over this case on remand. We conclude that the Petitioner is entitled to due process tolling of the statute of limitations. As a result, the judgment of the coram nobis court is reversed, and the case is remanded to the court for an evidentiary hearing on the merits of the petition. We decline to appoint a special judge for subsequent proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JILL BARTEE AYERS, JJ., joined.

Daniel Horwitz, Lindsay Smith, and Melissa K. Dix, Nashville, Tennessee, for the appellant, Carlos Stokes.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The lengthy procedural history reflects that the Petitioner and three codefendants, Jordan Clayton, Branden Brookins, and Carl Johnson, were charged with various offenses related to the April 10, 2015 murder of the seven-year-old-victim, who was fatally shot while playing outside after school. The defendants were initially charged with one count of first degree murder, but the State obtained a superseding indictment charging the defendants with first degree murder, conspiracy to commit first degree murder, reckless endangerment, two counts of attempted first degree murder, and two counts of employing a firearm during the commission of a dangerous felony.[1] The Petitioner and codefendants Clayton and Brookins were tried jointly. Before the trial, codefendant Clayton filed a motion to sever his trial from codefendant Brookins's trial, and the Petitioner orally joined the motion at the hearing. The trial court denied the motion, and at the trial, the defendants were convicted as charged in the superseding indictment. In the appeal from the conviction proceedings, the Petitioner challenged the sufficiency of the convicting evidence, the trial court's denial of the motion to sever, and the trial court's admitting a recording of Theodis Turner's preliminary hearing testimony because of memory loss. This court affirmed the Petitioner's convictions. *See State v. Jordan Clayton, Carlos Stokes, and Branden Brookins*, No. W2018-00386-CCA-R3-CD, 2019 WL 3453288, at *1-18 (Tenn. Crim. App. July 31, 2019), *perm. app. denied* (Tenn. Dec. 10, 2019).

On December 4, 2020, the Petitioner filed a petition for post-conviction relief, alleging multiple grounds of the ineffective assistance of counsel, actual innocence, and a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The Petitioner also contended that the cumulative effect of counsel's deficiencies entitled him to a new trial. The State filed its response on February 8, 2021. An amended petition was filed on August 10, 2022. The record does not reflect a resolution of the post-conviction proceedings.

On February 2, 2021, during the pendency of the post-conviction petition, the Petitioner filed the present petition for a writ of error coram nobis, alleging newly discovered evidence of actual innocence. The petition alleged that Theodis Turner and codefendant Johnson, the only witnesses implicating the Petitioner in the offenses, had recanted their respective trial testimony and that codefendant Brookins had recanted his previous police statement and asserted the Petitioner was innocent of the crimes. Relative to timeliness, the Petitioner conceded his petition was filed beyond the one-year limitations period but argued that due process tolling was warranted because the newly discovered evidence was later arising and was diligently presented to the coram nobis court. *See Nunley v. State*, 552 S.W.3d 800 (Tenn. 2018). The record does not reflect that the State filed a response to the coram nobis petition.

---

[1] Codefendant Clayton was also indicted and convicted of being a felon in possession of a handgun.

On July 11, 2022, the Petitioner filed a motion to continue the post-conviction and coram nobis proceedings, and the State did not oppose the motion. On August 3, 2022, the court entered an order compelling defense counsel to schedule a post-conviction hearing before the judge's term of office expired and to issue subpoenas and transfer orders, if necessary. Also on August 3, 2022, the Petitioner sought and was later granted an extraordinary appeal in which he challenged the court's denial of the motion to continue and requested removal of the judge. This court reversed the court's denial of the continuance but declined to remove the judge. *See Carlos Stokes v. State*, No. W2022-01049-CCA-R10-PC (Tenn. Crim. App. Aug. 18, 2022) (order). On October 17, 2022, the Petitioner filed an application for permission to appeal to the supreme court, which was denied on December 14, 2022. *See Carlos Stokes v. State*, No. W2022-01049-SC-R11-PC (Tenn. Dec. 14, 2022) (order). The mandate issued on December 15, 2022.

Before the mandate issued remanding the Petitioner's case, the post-conviction and coram nobis court entered an October 19, 2022 order to continue, which scheduled the post-conviction and coram nobis evidentiary hearings for October 31, 2022. In response, the Petitioner filed an October 19, 2022 notice and objection to the court's scheduling the hearings until the court reacquired jurisdiction pending the issuance of the mandate. The Petitioner requested that the court enter an order "regarding the ordered hearing date that provides meaningful advance notice for purposes of both compliance and the opportunity to obtain timely appellate review." The Petitioner, likewise, filed an October 20, 2022 application for an extraordinary appeal, asserting that the post-conviction and coram nobis court lacked jurisdiction to schedule evidentiary hearings on the petitions. This court determined that jurisdiction lay with the supreme court pending its decision on the Petitioner's application for permission to appeal regarding this court's declining to remove the judge. *See Carlos Stokes v. State*, No. W2022-01493-CCA-R10-CO (Tenn. Crim. App. Oct. 24, 2022) (order), *perm. app. denied* (Tenn. Dec. 19, 2022).

The post-conviction and coram nobis judge retired on August 31, 2022, but the supreme court, upon request, granted a designation allowing the judge to preside over the petitions until the matters were concluded. However, the Petitioner sought to alter or amend the supreme court's order allowing the judge to preside over the petitions. *See* T.R.A.P. 22; Tenn. R. Sup. Ct. 11. On January 23, 2023, the supreme reassigned the matters to a successor judge. *See Carlos Stokes v. State*, No. W2023-00083-SC-UNK-CO (Tenn. Jan. 23, 2023) (order). On February 13, 2023, the mandate issued, returning the matters to the successor judge.

On February 24, 2023, the Petitioner filed a motion to stay the post-conviction and coram nobis proceedings until the completion of the Shelby County Justice Review Unit's evaluation of the Petitioner's case and, alternatively, to schedule the post-conviction and coram nobis evidentiary hearings for a date that would provide reasonable notice to the Petitioner. The State did not oppose the motion to stay the proceedings. On the same day, the successor judge entered an order, which scheduled a status conference on the coram

- 3 -

nobis petition for March 2, 2023, and stayed the post-conviction proceedings. The order reflects, as well, that the judge determined it was inappropriate to address the involvement of the Justice Review Unit.

At the March 2, 2023 hearing, the coram nobis court and the parties scheduled an evidentiary hearing for September 7 and 8, 2023, to address the petitions for relief and anything pending and unresolved. However, on March 21, 2023, the court entered an order summarily dismissing the coram nobis petition after determining that it did not satisfy the requirements of Tennessee Code Annotated section 40-26-105 and *State v. Mixon*, 983 S.W.2d 661 (Tenn. 1999).

The written order reflects the coram nobis court determined that the petition was filed after the expiration of the one-year limitations period and that the Petitioner "failed to demonstrate the necessity for . . . due process tolling." The court found that the affidavits of trial witnesses "reflecting the 'newly discovered evidence'" were unsworn and did not individually or collectively "constitute credible newly discovered evidence" to warrant coram nobis relief. The court likewise determined that the "affidavits submitted by the Petitioner . . . were in fact available and known to all parties" before the Petitioner's sentencing hearing. The court determined that codefendant Johnson told "several versions of the activity" of the defendants before the shooting and that the jury assessed codefendant Johnson's credibility during its deliberations. The court determined that "[t]he same can also be said about Mr. Theodis Turner's preliminary hearing testimony which was used at trial."

The coram nobis court determined that the Petitioner was not without fault in raising his claims. The court found that untimeliness notwithstanding, the Petitioner "is the one person who would have absolutely known that he did not participate in the conspiracy to mete out revenge when he conspired to get a body for a body." The court found that the Petitioner

> would have known that he was not present, did not organize or dictate any substantial step toward the common goal of murder. If he were not present when he gave the order to kill or if he were not present during the commission of the event on that fateful day, [the Petitioner] would have known this information prior to his trial. If he had not participated in any way, in any role, that led to the murder of [the victim] he had the absolute right to testify at his trial.

This appeal followed.

- 4 -

## I. Statute of Limitations & Due Process Tolling

The Petitioner contends that the coram nobis court erred by summarily dismissing his petition for relief. He concedes that the petition was untimely but asserts that he was entitled to equitable tolling of the statute of limitations and to an evidentiary hearing on the merits of his petition. The State responds that the court did not err by summarily dismissing the petition because the Petitioner was not entitled to due process tolling of the limitations period.

A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." T.C.A. § 40-26-105(b) (2018); *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995); *see Cole v. State*, 589 S.W.2d 941 (Tenn. Crim. App. 1979). The purpose of a coram nobis proceeding "is to bring to the attention of the court some fact unknown to the court, which if known would have resulted in a different judgment." *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1966). The decision to grant or deny such a writ rests within the sound discretion of the court. *Jones v. State*, 519 S.W.2d 398, 400 (Tenn. Crim. App. 1974); *see Teague v. State*, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988) (*overruled on other grounds by Mixon*, 983 S.W.2d at 661) . A petition for a writ of coram nobis must be filed within one year of the judgment becoming final in the trial court. *Mixon*, 983 S.W.2d at 670. A judgment becomes final "thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010). "[T]he statute of limitations . . . is not an affirmative defense that must be specifically raised by the State in error coram nobis cases; instead, the . . . petition must show on its face that it is timely filed." *Nunley*, 552 S.W.3d at 829. A limited exception to the statute of limitations exists when due process requires tolling. *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001).

"When a petitioner seeks a writ of error coram nobis based on newly discovered evidence of actual innocence, due process considerations may require tolling of the statute of limitations." *Harris*, 301 S.W.3d at 145 (citing *Workman*, 41 S.W.3d at 101). "[B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992); *see Workman*, 41 S.W.3d at 102. However, a petitioner "must exercise due diligence in presenting the claim." *Harris*, 301 S.W.3d at 144. Whether due process principles require tolling the statute of limitations is a mixed question of law and fact and is reviewed de novo with no presumption of correctness. *See Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006) (*abrogated on other grounds by Brown v. Jordan*, 563 S.W.3d 196 (Tenn. 2022)).

The record reflects that the trial court's order denying the Petitioner's motion for a new trial was entered on February 9, 2018. *See Mixon*, 983 S.W.2d at 670 ("If a post-trial motion is timely filed, the judgment becomes final upon entry of an order disposing of the post-trial motion.") The one-year limitations period in which to seek coram nobis relief expired on February 9, 2019. The petition for relief was filed on February 2, 2021, approximately two years later.

Our supreme court has determined that "compliance with the timely filing requirement . . . is an essential element of a coram nobis claim." *Nunley*, 552 S.W.3d at 828. However, a petitioner can request equitable tolling of the limitations period.

> To be entitled to equitable tolling, a prisoner must demonstrate with particularity in the petition: (1) that the ground or grounds upon which the prisoner is seeking relief are "later arising" grounds, that is grounds that arose after the point in time when the applicable statute of limitations normally would have started to run; [and] (2) that, based on the facts of the case, the strict application of the statute of limitations would effectively deny the prisoner a reasonable opportunity to present his or her claims . . . . A prisoner is not entitled to equitable tolling to pursue a patently non-meritorious ground for relief.

*Id*. at 829 (internal citation omitted). Likewise, "the coram nobis petition must be filed within a time period that 'does not exceed the reasonable opportunity afforded by due process.'" *Id*. at 830 (quoting *Sample v. State*, 82 S.W.3d 267, 275 (Tenn. 2002)); *see Workman*, 41 S.W.3d at 103.

The alleged newly discovered evidence relates to the recantations of Theodis Turner and codefendant Johnson, both of whom testified at the trial, and codefendant Brookins, whose pretrial statement was received as trial evidence. In order to provide context for the alleged newly discovered evidence, a review of the trial evidence is necessary.

## A.      Trial Evidence

The December 2017 trial evidence established that on April 10, 2015, the seven-year-old victim played outside of her home with friends after school. As the children played, Angela Bibbs yelled "get the kids, they shooting." Alexis Hawkins saw a burgundy car and a "young man hanging halfway out of the car from the back seat behind the driver." The man leaning over the top of the car fired a gun over the top of the car. Ms. Hawkins heard six gunshots as the car moved down the street. Ms. Bibbs saw a man fire a gun from the passenger-side window, and she heard two gunshots. After the shooting, the victim was found with a gunshot wound to the head. Ms. Hawkins was later shown two photograph lineups. In the second lineup, she identified codefendant Clayton as the

shooter. In the first lineup, she identified a man who was not involved in the shooting but who had similar facial characteristics as codefendant Clayton.

Codefendant Johnson, who was not tried with the Petitioner and the remaining codefendants, testified that he provided "several versions of the activity" of the defendants before the shooting but that his trial testimony would be truthful "in the hope that he would receive leniency." He explained that his first police statement "was replete with lies" because he was scared but stated that his second statement and trial testimony were truthful.

Codefendant Johnson testified that on April 9, 2015, the day before the victim's shooting, he drove his mother's burgundy car and that he drove codefendant Clayton to a drug sale near Ms. Hawkins's home. Codefendant Johnson recalled that when they arrived at the buyer's home, the buyer and "six more other dudes" came outside. Codefendant Clayton sat on the front passenger seat, and the buyer, along with the other men, walked to the burgundy car. The men stood on the passenger-side of the car, with the exception of one man who walked around the rear of the car. After the drug transaction was complete, the buyer's brother, who was known as Rico, attempted to grab codefendant Clayton's gun. Codefendant Clayton and Rico "tussled," and Rico was shot in the chest. As codefendant Johnson drove away, "someone shot at the back" of the car. After they drove away, the buyer called codefendant Clayton's cell phone and asked why codefendant Clayton shot Rico. Codefendant Johnson overheard codefendant Clayton tell the buyer that Rico robbed codefendant Clayton "in front of [the Petitioner's] house back in November, December" and that Rico attempted to rob codefendant Clayton again.

Codefendant Johnson testified that earlier in the day of the victim's shooting, the Petitioner's fifteen-year-old sister was killed during a drive-by shooting. Codefendant Johnson stated that codefendant Clayton asked him to drive codefendant Clayton to Theodis Turner's house. Mr. Turner was known as "Big Nunu." Codefendant Johnson drove codefendant Clayton to Mr. Turner's house, but codefendant Johnson stated that he did not go inside or to the rear of the house. Codefendant Johnson said that while he and codefendant Clayton were at the house but sitting inside the burgundy car, the Petitioner arrived in a silver Infiniti. Codefendant Johnson said that the Petitioner asked to speak privately with codefendant Clayton and that both men got inside the Petitioner's car and drove away. Codefendant Johnson picked up codefendant Clayton a short time later at a predetermined location and returned to Mr. Turner's house, and the Petitioner arrived five minutes later.

Codefendant Johnson testified that "everyone" talked and joked outside the house for awhile and that he, the Petitioner, and codefendants Brookins and Clayton left in the burgundy car. Codefendant Johnson recalled that he was told to return to the area where Rico was shot the previous day. Codefendant Johnson drove down the street three times, and on the third time, the Petitioner said that "he did not care who was outside the house," that his younger sister was killed, and that he wanted "a body for a body." Codefendant

Johnson recalled that codefendant Brookins "hung out the window," said "something like, hey little, b----," and fired the gun once. The gun "jammed up" when codefendant Brookins attempted to shoot again. Codefendant Johnson said that codefendant Clayton hung out of the window and fired a gun a few seconds later. Codefendant Johnson identified the two guns as .40-caliber semi-automatic handguns, and he said codefendant Clayton was in the front passenger seat, codefendant Brookins was in the backseat behind codefendant Clayton, and the Petitioner was in the backseat behind codefendant Johnson. Codefendant Johnson said that Brandon Durr[2] was in the third-row seat. Codefendant Johnson said that the Petitioner was "in charge that day, telling people what to do" and that the others listened to the Petitioner because "he got a lot of people under him and tell[s] them what to do and they do it." Codefendant Johnson explained that he was a member of the Gangster Disciples gang and that the Petitioner was a member of the Bloods gang. Codefendant Johnson drove away and returned to Mr. Turner's house but instructed the Petitioner and codefendant Clayton to get out of the car before arriving at the house. When codefendant Johnson arrived at the house, codefendant Clayton "took off in the direction of Auriel Wiggins's house."

Ashinik Johnson, codefendant Johnson's mother, testified that on an unspecified date in April 2015, she overheard a telephone conversation between her son and codefendant Clayton. She recalled that their discussion was about "a little girl being shot" and about the rear of Ms. Johnson's burgundy car having a gunshot hole and that codefendant Clayton admitted "he killed the little girl."

Multiple witnesses who were outside at the time of the victim's shooting testified relative to the burgundy car moving down the street multiple times before the shooting began. Annie Vaughn testified that the person on the front passenger seat fired the gun at the victim and that after the victim lay on the ground, the front passenger looked out of the car's window, "raised his body out so he could see the back and said I got her." Ms. Vaughn later identified codefendant Clayton as the shooter.

Codefendant Clayton's redacted police statement was presented to the jury. In the statement, he admitted he had been in the burgundy car with codefendant Johnson. On April 9, the men went to the area of the shooting for a drug sale with someone identified as Red, and during the transaction, "Rico pulled out a gun" and attempted to rob codefendant Clayton, who stated Rico had robbed him about five months before the shooting. Codefendant Clayton said that a "tussle" ensued, that he shot Rico, and that codefendants Clayton and Johnson fled the scene. On April 10, codefendant Clayton was at Mr. Turner's house, and codefendant Clayton stated that "there was a discussion" about the Petitioner's younger sister's killing the previous night. Codefendant Clayton stated that he left Mr. Turner's house, went to his girlfriend's apartment, and remained there until April 11. He said that he did not know about the victim's death until April 11.

---

[2] The name appears in the record as Brandon Durr and Brandon Derr. We use Durr for consistency.

Codefendant Brookins's redacted police statement was also presented to the jury. He admitted that he was inside the burgundy car seated behind the driver during the victim's shooting. He likewise admitted that two people inside the vehicle had guns and that multiple shots were fired.

The Petitioner did not provide a formal police statement but spoke with investigators regarding his younger sister's killing. During the discussion, the Petitioner admitted that he had been at Mr. Turner's house on the day of the victim's shooting. The Petitioner stated that he "really didn't give a f--- about [the victim's] death because his own sister was dead."

Theodis Turner testified that since the shooting, he had suffered a stroke and that, as a result, he did not recall the events of April 10, providing a police statement, or testifying at the preliminary hearing. The recording of his preliminary hearing testimony was played for the jury.

In the recording, Mr. Turner testified that the Petitioner and codefendants Brookins, Clayton, and Johnson arrived at Mr. Turner's house and that the Petitioner was upset about his sister's killing. Mr. Turner recalled the men discussing the robbery of codefendant Clayton at the Petitioner's house before the Petitioner's sister's killing. Mr. Turner stated that the Petitioner "said something had to be done about the murder of his sister." Initially, Mr. Turner stated that the Petitioner did not specify "what needed to be done" but acknowledged that he told the police that the Petitioner "wanted a body" because of his sister's killing. Mr. Turner said that all of the men left his house but that only codefendants Brookins and Johnson returned "a short time later." Mr. Turner did not see any of the men with guns but said the men regularly possessed weapons.

Mr. Turner's statement to the police was read to the jury and stated:

[I w]as at [my] house and [codefendant Clayton] came over to sale [sic] me some bars. He was in [codefendant Johnson's] red truck and [codefendant Johnson] was driving. He came to the back porch and sold me the bars. [The Petitioner] pulled up in his grey Infiniti with [codefendant Brookins]. [The Petitioner] got out of the car. I saw that [codefendant Brookins] had a black gun. [The Petitioner] called [codefendant Clayton] to the side and told him to bring him a body for a body and he wanted it now. [Codefendants Clayton and Brookins and the Petitioner] pulled off in [the Petitioner's] car and [codefendant Johnson] pulled off behind them. I think 15 minutes went by and they pulled back but [codefendant Clayton] was not with them. They came to the back porch looking suspicious. I asked them what happened but no one said s---. I began hearing sirens and they all left from my house.

The statement also reflected that Mr. Turner only saw codefendant Johnson, codefendant Clayton's brother, who was known as "Little B," and codefendant Brookins inside the burgundy car. Mr. Turner stated that the Petitioner wanted a body for a body

> [b]ecause [the Petitioner] fel[t] that [codefendant Clayton] was responsible for his sister getting kill[ed] . . . because [codefendant Clayton] shot somebody the night before and they thought that [codefendant Clayton] lived at [the Petitioner's] house, because the same guy [codefendant Clayton] shot robbed [codefendant Clayton] some months back at [the Petitioner's] house.

Forensic evidence showed that a .40-caliber bullet recovered from Ms. Hawkins's house had the "same class characteristics" as a bullet test-fired from a gun recovered from codefendant Clayton. Cell phone and GPS data placed codefendants Johnson and Clayton at the scene at the time of the victim's shooting.

The Petitioner and codefendants Clayton and Brookins declined to testify. However, Auriel Wiggins testified on behalf of codefendant Clayton that he was at her house in the afternoon of April 10 and remained there until the next day. She did not provide this information to the police during their investigation. *See Jordan Clayton, Carlos Stokes, and Branden Brookins*, 2019 WL 3453288, at *1-6.

## B.    Newly Discovered Evidence

## 1.    Codefendant Carl Johnson

A certified transcript of a November 29, 2020 recorded telephone interview of codefendant Johnson by the defense investigator was attached to the petition for relief. The transcript reflects that codefendant Johnson said that he was involved in this case and that he knew the Petitioner through a mutual friend, codefendant Jordan Clayton. Regarding the events leading to the victim's shooting, codefendant Johnson said that "Jordan (Unintelligible) and his two brothers. And they tried to rob (Unintelligible). And Jordan (Unintelligible). And so they remember (Unintelligible) Jordan and [the Petitioner] . . . So I did (Unintelligible) Jordan Clayton (Unintelligible). And he wanted to go to (Unintelligible) Jordan Clayton (Unintelligible) and then (Unintelligible) we had (Unintelligible) to go see if I had some beer, and he wanted me to take him over there. Said he didn't want nobody to come but me," codefendant Clayton, and codefendant Brookins. Codefendant Johnson said that he, codefendant Clayton, and codefendant Brookins were in the car and that codefendant Brookins "[was] the only (Unintelligible) the gun (Unintelligible)." When asked where the Petitioner was when "all that happened," codefendant Johnson said that the Petitioner "wasn't even nowhere in the area." Codefendant Johnson did not know where the Petitioner was when the shooting occurred. Codefendant Johnson did not know if the Petitioner had been at Mr. Turner's house at the time of the shooting but said the Petitioner had been at the house earlier that day.

Codefendant Johnson said he did not hear any conversations between Mr. Turner and the Petitioner.

Codefendant Johnson stated that the shooting occurred because of "the previous robbery." He stated that Rico's brother, whom he knew as Del, had robbed codefendant Clayton, "who was in the (Unintelligible) with Rico's brother." Codefendant Johnson said that codefendant Clayton and Rico "had beef earlier, a day or so before [the shooting]." Codefendant Johnson said that at the time of the victim's shooting, he, codefendant Clayton, and codefendant Brookins were in the car. Codefendant Johnson agreed that he implicated the Petitioner in the shooting and said that he implicated the Petitioner for "no reason." When asked to explain why he would implicate the Petitioner if the Petitioner had no involvement in the victim's shooting, codefendant Johnson said, "S---, I don't know." He said that codefendant Brookins told him to implicate the Petitioner because codefendant Brookins was "[t]rying to get rid of him now (Unintelligible) . . . so he can get to him."

Codefendant Johnson stated that the Petitioner did not have anything to do with the shooting, that the Petitioner was not present for the shooting, and that the Petitioner did not "order" codefendant Johnson "to do it." Codefendant Johnson denied that he possessed a gun at the time of the shooting and stated that he "didn't even know about it, really." He said that codefendant Brookins "just shot out of nowhere" and that he thought codefendant Brookins was firing at "the dudes" because "they're doing business." When asked if any of the people at the scene had been involved in the previous robbery, codefendant Johnson said that he drove the car and could not see who was there. He denied having gang membership in the Bloods or the Gangster Disciples. He said he received a twenty-five-year sentence in this case. Codefendant Johnson said visitors were not allowed at the correctional facility in which he was incarcerated.

2.    **Codefendant Branden Brookins**

A certified transcript of a December 3, 2020 recorded telephone interview of codefendant Brookins by the defense investigator was attached to the petition for relief. The transcript reflects that codefendant Brookins was incarcerated in Morgan County, Tennessee, at the time of the interview and had been in custody since April 15, 2015. He stated that the Petitioner was not with him at the time of the victim's killing and that only "Clayton," "Johnson," and "Brandon Durr," who was never charged in this case, were in the car with codefendant Brookins. Codefendant Brookins stated that he read "about Stokes saying a body for a body" but that "[i]t never occurred. It never -- it never occurred that day. The meeting never occurred, like what they -- all of this was made up." When asked if anyone inside the car knew what was "getting ready to go down," codefendant Brookins stated, "(Unintelligible) not really -- not really because (Unintelligible) shooting (Unintelligible) she was standing right there (Unintelligible) shoot -- shoot (Unintelligible) they made a mistake and hit that little girl." When asked who was at the scene "that you

- 11 -

all were beefing with," codefendant Brookins stated, "I don't even – I don't (Unintelligible) because (Unintelligible) ain't got no (Unintelligible). But I was on the way to make a drug sale." Codefendant Brookins admitted to firing a gun but stated that the Petitioner was not present. When asked if the Petitioner had been at Mr. Turner's house sometime before the shooting, codefendant Brookins said codefendants Johnson and Clayton were at the house with codefendant Brookins but that the Petitioner was not there. Codefendant Brookins denied telling anyone to tell the police that the Petitioner was involved in the victim's shooting but said codefendant Clayton "told them to do it." When asked if he knew why codefendant Clayton told them to implicate the Petitioner, codefendant Brookins said, "Because (Unintelligible) got killed (Unintelligible) killed not even 24 hours before she got -- she died (Unintelligible) and the other little girl got killed (Unintelligible) that Friday evening. So . . . it was because (Unintelligible) it was retaliation because his sister got killed, but it wasn't." Codefendant Brookins said that the victim's shooting "was just purely accidental."

When asked if someone fired a gun at the burgundy car in which he and the others had been, codefendant Brookins said that "it happened so fast" and that "we got to go to this street to get to where we're going anyway." Codefendant Brookins said that he did not conduct the drug sale because the shooting occurred. He admitted that he sold marijuana and Xanax. He said that he received a ninety-five-year sentence and that his post-conviction evidentiary hearing was scheduled for January 6, 2021. He agreed that his post-conviction attorney knew he was speaking with the investigator and said, "[t]his time what I want to do is right. . . . I can't live my life knowing somebody else is incarcerated and I'm the one -- the reason he incarcerated." Codefendant Brookins said that he "want[ed] to be charged with what I was supposed to be charged with," that the "motive was not intentional," and that he knew the Petitioner was innocent. Codefendant Brookins said that he would do whatever he needed to do to "make it right on [the Petitioner's] behalf."

Codefendant Brookins stated that although he gave a police statement, he did not tell the police that the Petitioner wanted a body for a body. Codefendant Brookins said codefendant Johnson told the police that the Petitioner wanted a body for a body. He admitted though that he "gave them what they wanted." He admitted being a member of the Bloods gang and said everyone inside the car was a Bloods member, except codefendant Johnson, who was a Gangster Disciples member. Codefendant Brookins said codefendants Johnson and Clayton were friends, despite being members of different gangs.

Codefendant Brookins stated that the Petitioner had nothing to do with the victim's shooting. Codefendant Brookins stated, "[The Petitioner] wasn't there. He wasn't on the scene. He wasn't -- we never had a meeting about a body for a body meeting. I don't even know where it came from. And [the Petitioner] -- he had nothing to do with nothing."

- 12 -

The record also contains a certified transcript of a subsequent interview on August 9, 2021. In the interview, codefendant Brookins stated that the Petitioner was not an occupant inside the burgundy car on April 10, 2015. Codefendant Brookins said that he did not see the Petitioner in possession of a firearm and that he did not hear the Petitioner say the Petitioner wanted a body for a body. Codefendant Brookins said that at the time of his police interview, he was "[o]ut of my mind, high, scared." He said he had taken "Xanax bars," which made him "aware of nothing." He recalled, though, that the police threatened him with the death penalty and life imprisonment for killing the victim. He said that he had never been charged with a serious offense before this case and that he told the police "what they wanted to hear." He said the police told him that he would go home "[i]f I said it." He said that the Petitioner had nothing do with the victim's killing.

The record further contains an affidavit executed by defense investigator Kevin Gallagher, who interviewed codefendant Brookins at the correctional facility in which he was housed on August 9, 2021. The affidavit reflects a summary of the August 9 interview, and additional information after the investigator turned off the recording device. During this further discussion, codefendant Brookins pointed to piece of paper on a table inside the interview room and stated, "It's like you are looking the other way, and I steal this paper. You didn't know I was going to steal it, but you get charged with conspiracy. That's what happened to me." Codefendant Brookins said that codefendant Clayton was the shooter and that codefendant Clayton had "beef" with a man identified as Rico, who had "tried to rob him resulting in a shooting" the day before the victim's shooting. Codefendant Brookins said that on the day of the victim's shooting, the Petitioner was not inside the burgundy car but that Brandon Durr, codefendant Clayton's younger brother, was an occupant. Codefendant Brookins said that Mr. Durr also did not know the shooting was going to happen.

Relative to Mr. Turner's police statement, codefendant Brookins said that it was "completely impossible" for Mr. Turner to tell the police that all of the defendants heard the Petitioner say he wanted a body for a body because codefendant Brookins "never had contact" with Mr. Turner on the day of the victim's shooting. Codefendant Brookins said that while he was at Mr. Turner's house on the day of the victim's shooting, he remained on the "front side" of the house talking to his girlfriend on his cell phone while codefendants Clayton and Johnson spoke to Mr. Turner at the rear of the house.

Codefendant Brookins stated that photographs of the burgundy car would reflect that the rear passenger door panel "next to where he was seated was missing" and that he had no means of opening the door nor lowering the window. He said that it was impossible for him to have done any shooting from the burgundy car.

Codefendant Brookins stated that the Petitioner was not a gang member and was a responsible person who cared for his unwell mother and for the children of the Petitioner's late brother. Codefendant Brookins did not believe the Petitioner would become involved

in circumstances jeopardizing the Petitioner's ability to provide for his family's needs. Codefendant Brookins believed that the Petitioner "took the rap" for Mr. Durr.[3]

### 3.    Theodis Turner

The January 11, 2021 sworn affidavit of Theodis Turner was attached to the petition for relief. In the preliminary hearing testimony, Mr. Turner testified that the Petitioner said the Petitioner "wanted a body for a body" because the Petitioner "felt Jordan Clayton was responsible for [the Petitioner's] sister getting killed." However, Mr. Turner recanted this testimony in the affidavit and affirmed that "[i]n truth, [the Petitioner] did not say that he wanted a body for a body" and that Mr. Turner did not "hear [the Petitioner] say anything like that." Mr. Turner explained in the affidavit that after the Petitioner and the codefendants were arrested, the police came to his house and accused him of lying, insisting that he possessed information about the victim's killing. Mr. Turner stated that the "police scared [him] into testifying" that he heard the Petitioner say the Petitioner "wanted a body for a body." Mr. Turner stated that the police told Mr. Turner that he "would be charged with conspiracy to commit murder if [he] did not sign a statement indicating that [the Petitioner] wanted a body for a body." Mr. Turner stated that he believed he would be charged in this case if he "did not say what the police wanted [him] to say," that he recalled the room at the police department in which he was threatened by the police, and that the police did not read him any *Miranda* rights. Mr. Turner said he "agreed to sign a statement and testify to whatever the police wanted [him] to say in order to avoid being charged with conspiracy to commit murder."

We note that before executing the affidavit, Mr. Turner and the defense investigator spoke on the telephone on November 23, 2020, and December 5, 2020. The digital recordings of their conversations were reduced to certified transcripts on December 2, 2020, and December 6, 2020, respectively. In the recordings, Mr. Turner denied that there had been a meeting at his house before the victim's shooting but said that the Petitioner, the codefendants, and one or two people who were with codefendant Clayton "just pulled up to my house." Mr. Turner did not know the people with codefendant Clayton. Mr. Turner said that the Petitioner did not say he wanted a body for a body while at his house. Mr. Turner said that he implicated the Petitioner because the three or four detectives who spoke to Mr. Turner "scared" him "into saying that s---." He said the detectives told him that the Petitioner said the Petitioner wanted a body for a body. Mr. Turner said that his police statement was "already wrote down" by the detectives and that the substance of the statement "didn't make no sense . . . there's something wrong with that." During the calls, he provided consistent information, as contained in his affidavit, regarding his being

---

[3] The record also contains a certified transcript of an August 18, 2021 interview of codefendant Clayton. Codefendant Clayton stated, in relevant part, that the Petitioner was not involved in the victim's shooting, was not a gang member, was not an occupant inside the burgundy car, and never said he wanted a body for a body. Codefendant Clayton likewise stated that the police "forced [Mr. Turner] into saying some stuff . . . that was not true."

threatened with a conspiracy charge. He admitted that he was previously affiliated with the Bloods gang but said that he did not "get down with them" any longer. He said he would sign an affidavit.

## C.     Due Process Tolling

Although the February 2, 2021 petition was filed after the limitation period expired, the record reflects that it was filed soon after the Petitioner obtained newly discovered evidence. The alleged newly discovered evidence was obtained by the Petitioner beginning on November 29, 2020, with codefendant Johnson's interview, during which codefendant Johnson stated that the victim's shooting was related to a previous robbery involving codefendant Clayton and Rico. Codefendant Johnson said that he and codefendants Brookins and Clayton went to the scene of the victim's shooting. Codefendant Brookins possessed the gun, and the Petitioner "wasn't even nowhere in the area." Codefendant Johnson did not know the Petitioner's whereabouts at the time of the shooting. Codefendant Johnson said that codefendant Brookins told him to implicate the Petitioner in the victim's shooting because codefendant Brookins was attempting to "get rid" of the Petitioner. Other evidence showed gang affiliations with the Bloods and the Gangster Disciples. Codefendant Johnson stated that the Petitioner did not have anything to do with the victim's shooting, that the Petitioner was not present for the shooting, and that the Petitioner did not "order" codefendant Johnson "to do it." Codefendant Johnson said that he "didn't really know about [the shooting], really," that codefendant Brookins fired the gun "out of nowhere," and that codefendant Johnson thought codefendant Brookins was firing "at the dudes" because "they're doing business." This evidence, if true, is in direct contravention of codefendant Johnson's trial testimony, which implicated the Petitioner in the victim's shooting.

On December 3, 2020, which was four days after codefendant Johnson's interview, the defense investigator spoke to codefendant Brookins, who stated that the Petitioner was not involved in the victim's shooting, was not inside the burgundy car at the time of the shooting, and did not state he wanted "a body for a body." Codefendant Brookins said a meeting at Mr. Turner's house did not occur. Codefendant Brookins stated that codefendant Clayton instructed "them" to implicate the Petitioner in the offenses but that the Petitioner was innocent. Codefendant Brookins said that he did not tell the police that the Petitioner said the Petitioner wanted a body for a body but that he "gave them what they wanted." Codefendant Brookins stated, though, that the Petitioner had nothing to do with the victim's shooting, that the Petitioner was not present during the shooting, that the men never had a meeting about a body for a body, and that codefendant Brookins did not know from where the body-for-a-body meeting came. This evidence was in direct contravention of the trial evidence implicating the Petitioner.

On January 11, 2021, which was slightly more than one month after codefendant Brookins's interview, Theodis Turner signed a sworn affidavit recanting his preliminary hearing testimony and police statement. The affidavit reflects that the Petitioner did not say he wanted a body for a body due to his sister's killing. Mr. Turner stated that after the Petitioner's and the codefendant's arrests, the police came to Mr. Turner's house, accused him of lying, and threatened to charge him in this case. Mr. Turner asserted that he was coerced into testifying that the Petitioner wanted a body for a body and that he agreed to sign the police statement and testify to what the police wanted in order to avoid being charged. This evidence was in direct contravention of the trial evidence implicating the Petitioner.

The record reflects that the witness' and the codefendants' recantations were discovered after the judgments became final and were, therefore, later-arising. "Recanted testimony may qualify as newly discovered evidence and justify the granting of a writ of error coram nobis." *Kenneth J. Cradic v. State*, No. E2016-01082-CCA-R3-ECN, 2017 WL 2304028, at *3 (Tenn. Crim. App. May 26, 2017), *perm. app. denied* (Tenn. Oct. 3, 2017). The trial evidence implicating the Petitioner in the victim's shooting came primarily from Mr. Turner and codefendant Johnson. None of the trial witnesses who were present during the shooting identified the Petitioner as being inside the burgundy car. Codefendant Brookins admitted to the police that he was involved in the shooting, and although ballistic and GPS evidence placed codefendants Johnson and Clayton at the scene at the time of the victim's shooting, no such evidence implicated the Petitioner.

The petition for relief states that codefendants Brookins and Johnson were incarcerated at the time of their respective recorded interviews and that prison officials were not permitting visitors due to the COVID-19 pandemic, preventing defense counsel from obtaining sworn affidavits from the codefendants. The petition likewise states that counsel filed the petition for relief with certified transcripts of their respective recorded telephone interviews in an effort to diligently file the petition for relief "as quickly as feasible under the circumstances." Defense counsel stated that he anticipated filing an amended petition after prison visitation resumed and verification could be obtained. The record reflects that codefendant Johnson's interview occurred on November 29, 2020, and that the transcriber certified the transcript on December 22, 2020. Codefendant Brookins's interview occurred on December 3, 2020, and the transcriber certified the transcript on December 30, 2020. Mr. Turner's affidavit was signed on January 11, 2021, and the coram nobis petition was filed less than one month later. Upon de novo review, we conclude that the Petitioner exercised due diligence in presenting the later-arising evidence to the coram nobis court. *See Lajuan Harbison v. State*, No. E2019-01683-CCA-R3-PC, 2020 WL 6747023, at *17-18 (Tenn. Crim. App. Nov. 17, 2020) (determining that the petitioner exercised due diligence in pursuing coram nobis relief by filing the petition less than one year after discovering new evidence); *see also Harris*, 301 S.W.3d at 144 (stating that due process tolling was not warranted when the petitioner waited six years to present a coram nobis claim after learning about alibi evidence and waiting almost two years after learning

of third-party confession) (*overruled on other grounds by Nunley*, 552 S.W.3d at 828); *Nunley*, 552 S.W.3d at 830-31 (due process tolling is not warranted when the petitioner waited two years to present his coram nobis claim after learning of new evidence). As a result, the Petitioner has established that strict application of the statute of limitations denied him a reasonable opportunity to present his claims. We conclude that he has established he is entitled to equitable tolling of the statute of limitations. Therefore, we reverse the judgment of the coram nobis court and remand this case for an evidentiary hearing on the merits of the petition.

In reaching this conclusion, we have only considered the coram nobis court's determination that the Petitioner was not entitled to due process tolling of the statute of limitations. The merits of the Petitioner's claims remain questions for the court to determine after an evidentiary hearing. To that end, we take this opportunity to express our concern with the court's determination that the Petitioner was not without fault in raising his claims because the Petitioner was "the one person who would have absolutely known that he did not participate in the conspiracy to mete out revenge when he conspired to get a body for a body" and that "he had the absolute right to testify at his trial." In resolving the merits of the Petitioner's claims, we caution the court to be mindful that the State, not the Petitioner, had the burden of proof at the trial. As a criminal defendant, the Petitioner was presumed innocent at his trial. *See* T.C.A. § 39-11-201 (2018). He was entitled to exercise his right to remain silent and had no obligation to testify in his defense. *See* U.S. Const. amend. V, XIV; Tenn. Const. art. I, § 9; T.C.A. § 39-11-201(c); *State v. Jackson*, 444 S.W.3d 554, 585 (Tenn. 2014).

## II.     Request for the Appointment of a Special Judge

The Petitioner contends that a special judge should be appointed to preside over his petitions for relief. In support, he points to the circumstances surrounding his motion, which the State did not oppose, to stay the post-conviction and coram nobis proceedings until the completion of the Shelby County Justice Review Unit's evaluation of the Petitioner's case. After various scheduling conflicts, on February 24, 2023, defense counsel sought clarification from the court as to whether the case would be stayed pursuant to the parties' agreement and expressed concern that the court had indicated to the prosecutor that the court "might not be inclined to accept the Parties' agreement after all." Counsel requested that the court accept the agreement and, alternatively, that the court schedule an evidentiary hearing on the coram nobis petition with "reasonable advance notice."

Based upon the successor judge's alleged *ex parte* communication with the State about the parties' agreement to stay the proceedings and upon the previous lengthy procedural history involving the original judge, the Petitioner requests that this court appoint a special judge in this case. *See* Tenn. R. Sup. Ct. 10, Cannon 2, Rule 2.9 (ex parte communications). However, the Petitioner concedes that he has not filed a motion in the

coram nobis court to recuse the successor judge, and, as a result, recusal is not properly before this court. *See* Tenn. R. Sup. Ct. 10B, §§ 1, 2. Upon remand, the Petitioner is not prohibited from seeking recusal should he believe a valid basis exists, but we decline to consider recusal before a motion has been filed in the coram nobis court and before the successor judge has been afforded the opportunity to consider and respond to a motion.

Based upon the forgoing and the record as a whole, the judgment of the coram nobis court is reversed. The case is remanded for an evidentiary hearing on the merits of the petition. The Petitioner's request for the appointment of a special judge is denied.

_____
ROBERT H. MONTGOMERY, JR., JUDGE